UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

**ETERNAL STRATEGIES, LLC., a
Delaware limited liability company,**

          Case No.

    **Plaintiff,**

v

**CLICKBOOTH HOLDINGS, INC., a
Delaware corporation,**

**and**

**CENTRE LANE PARTNERS, LLC, a
Delaware limited liability company,**

    **Defendants.**
_____/

## COMPLAINT

Plaintiff, ETERNAL STRATEGIES, LLC., a Delaware limited liability company ("Eternal"), sues Defendants, CLICKBOOTH HOLDINGS, INC. ("CHI"), a Delaware corporation, and CENTRE LANE PARTNERS, LLC ("Centre Lane" together with CHI "the Defendants"), a Delaware limited liability company, and alleges as follows:

## INTRODUCTION

Eternal and CHI entered into a purchase agreement dated June 20, 2016 whereby Eternal would sell 100% of the equity interests in Clickbooth.com, LLC, a Florida limited liability company (the "Company") to CHI. CHI is a holding company created by the private investment firm, Centre Lane. It was Centre Lane who negotiated the purchase agreement.

1

The purchase price paid by CHI included an Earn-Out Payment based upon the Company's EBITDA as of December 31, 2016, six-months after the closing. The parties also contractually agreed that they would jointly engage an accounting firm to act as an arbitrator solely to resolve the disputed EBITDA amounts should the parties disagree as to the EBITDA amount and hence the Earn-Out Payment. The Earn-Out Payment formula had a minimum floor of $3,000,000, below which no payment would be owed.

To protect against CHI manipulating the EBITDA through its operation of the Company, CHI contractually agreed not to, directly or indirectly, take any actions in bad faith with the intent of avoiding or reducing any Earn-Out Payment and to operate the Company's business substantially in accordance with past practices and with the objective of facilitating the continued growth of the Company during the Earn-Out Payment period. The parties did not agree to have the accounting firm act as arbitrator for these provisions.

This contractual promise was based upon fraudulent misrepresentations made by Centre Lane. These representations, made by Centre Lane before the agreement was entered, were false at the time they were made. Centre Lane knew that it was not going to have the Company act in good faith or operate the Company in a commercially reasonable manner, but instead, was going to take affirmative steps to make sure that the Company's EBITDA was below the minimum threshold and the Earn-Out Payment would be zero.

After the closing, CHI and Centre Lane did not operate the Company in good faith or in accordance with past practices in order to facilitate continued growth, but instead Centre Lane induced the Company to conduct its business in bad faith and take overly aggressive legal and accounting positions with the intent of claiming that the Company's EBITDA is well-below the $3,000,000 floor and that no Earn-Out Payment is owed. Many of the Company's accounting

positions have deviated from past practices and were taken for the sole purpose of reducing the Company's EBITDA, and thus its Earn-Out Payment. Notably, among its commercially unreasonable actions taken in bad faith, the Company has deviated from past practices in calculating for EBITDA purposes certain transactional and legal expenses. It has also deviated from past practices in accounting for accounts receivable and in collecting these receivables because collecting the hundreds of thousands of dollars in accounts receivable would result in millions of dollars in Earn-Out Payment to Eternal.

## JURISDICTION AND VENUE

1. Eternal is a Delaware limited liability company, and its member has its principal place of business in Sarasota, Florida.

2. CHI is a Delaware corporation with its principal place of business located in New York City. CHI is a wholly owned subsidiary of Centre Lane.

3. Centre Lane is a Delaware limited liability company with its principal place of business located in New York City.

4. The Company's principal place of business is Sarasota, Florida.

5. This Court has personal jurisdiction over CHI because it failed to perform acts required by the contract to be performed in the state, including causing the Company to act in bad faith with the intent of avoiding or reducing the Earn-Out Payment and not to use commercially reasonable efforts to facilitate the continued growth of the Company during the Earn Out Period.

6. This Court has personal jurisdiction over Centre Lane because it made false representations in the state which induced Eternal to enter into a purchase agreement, a contract under which Centre Lane had no intention to direct CHI to perform.

7. This Court has jurisdiction pursuant to 28 U.S.C. §1332, as this matter meets the requirements for federal jurisdiction pursuant to diversity of citizenship.

8. Venue is proper within the Middle District of Florida pursuant to 28 U.S.C. §§1391(b) because it is a judicial district in which a substantial part of events or omissions giving rise to the claim occurred.

## GENERAL FACTUAL ALLEGATIONS

9. On June 20, 2016, Eternal and CHI entered into a Membership Interest Purchase Agreement ("Purchase Agreement") pursuant to which CHI purchased 100% of Eternal's membership interest in the Company.

10. The Purchase Agreement provides that a portion of the purchase price would be paid in the form of an Earn-Out Payment. The Earn-Out Payment would be based upon the Company's EBITDA for the Company's fiscal year ended December 31, 2016. The Purchase Agreement contained a minimum EBITDA number of $3,000,000.00 below which CHI would not owe any monies to Eternal for the Earn-Out Payment.

11. If the parties could not reach an agreement on the amount of the Earn-Out Payment, they would engage a previously agreed upon accounting firm to act as an arbitrator to resolve solely the disputed EBITDA amounts.

12. As part of the Purchase Agreement, CHI undertook contractual duties (1) not to directly or indirectly take any actions in bad faith with the intent of avoiding or reducing any Earn-Out Payment hereunder and (2) to use commercially reasonable efforts to operate the Company substantially in accordance with past practices and with the objective of facilitating the continued growth of the Company during the Earn-Out Period.

13. During negotiations, Centre Lane represented to Eternal that it would uphold those duties as described in the Purchase Agreement. However, Centre Lane had no intention of operating the Company in good faith and in accordance with past practices. Rather, Centre Lane set the EBITDA threshold at a number that seemed reasonable to Eternal based upon the Company's past practices and performance, but that Centre Lane knew it would not allow the Company to reach, in part, because they intended to take legal and strategic positions that would keep the Company from doing so.

14. For example, Ken Lau and Eric Drozdov of Centre Lane met with David Fairey and Amanda Marshall of Eternal on March 31, 2016 at the Company's offices in Sarasota, Florida. Mr. Lau and Mr. Drozdov, on behalf of Centre Lane, represented that they had a clear foundational understanding of the Company's accounting and financial functions and practices, specifically with respect to revenue recognition, customer collections and payments, asset capitalization, historical trends, and forecasted results, including and especially the Company's current calculation of EBITDA.

15. Further, during a May 18, 2016 conference call, William James and Eric Drozdov of Center Lane represented to David Fairey and Amanda Marshall of Eternal once again that Centre Lane understood and agreed with the Company's EBITDA calculation methodology, specifically with respect to the add-back of transaction expenses for the calculation of EBITDA. During the call, which included accountants engaged by Centre Lane and accountants engaged by Eternal, Centre Lane's representatives affirmed their agreement with the practice of adding back transaction expenses when calculating EBITDA.

16. At the time these misrepresentations were made, Centre Lane had no intention to fulfill its promises because while Centre Lane represented to Eternal that they were in full

5

agreement with the Company's current approach to EBITDA, Centre Lane omitted to inform Eternal of their intended approach to calculating the Company's EBITDA post-sale, which was to materially deviate from past practices with the express purpose of lowering the Company's EBITDA.

17. In other words, rather than directing CHI to operate the Company in accordance with past practices, Centre Lane intended all along to have CHI consider hundreds of thousands of dollars of transaction costs as part of the Company's operating expenses, to write off debt unnecessarily, and to take other legal and accounting positions in bad faith. Further, Centre Lane intended, inconsistent with the Company's past practices, to reduce the Company's EBITDA and thus reduce the Earn-Out Payment.

18. Had Centre Lane informed Eternal of its intent not to fulfil its promises, Eternal would have negotiated a different EBITDA threshold or would have otherwise compensated for this difference in a satisfactory manner.

19. Centre Lane did, in fact, have CHI and the Company take numerous actions with the direct intent of lowering the Company's EBITDA for the purpose of lowering the Earn-Out Payment to Eternal. They not only deviated from the Company's past practices by taking accounting positions designed solely to reduce the EBITDA, but also took business action with the express purpose of trying to reduce or eliminate the Earn-Out Payment.

20. For example, to lower the EBITDA number and thus the Earn-Out Payment, Centre Lane not only had the Company include hundreds of thousands of dollars of transactional costs as Company operating expenses, but it also had the Company deviate from past practices in seeking to collect accounts receivable with the express purpose of not collecting the debt during the Earn-Out Period. Centre Lane then claimed that the accounts receivable were bad debt and

6

that it needed to reserve the full amount of this debt. This reserve was done for the sole purpose reducing or eliminating the Earn-Out Payment. In other words, Centre Lane had the Company deviate from past practices and to decline to collect its accounts receivables because the collection of hundreds of thousands of dollars from these customers would have resulted in millions in Earn-Out Payments to Eternal.

21. As a result of CHI's breaches and Centre Lane's fraudulent misrepresentations, the Company's EBITDA calculations were not made in good faith and in a commercially reasonable manner consistent with past practices, but instead were made in a bad faith manner deviating from past practices. This resulted in an EBITDA calculation that was not even close to the $3,000,000 floor, but instead totaled $1,441,034.

22. Eternal needs this Court to determine if CHI violated its obligations not to take any actions to lower the EBITDA. A determination by this Court is necessary to enable the accounting firm arbitrator to render a fair decision as to the amount of the EBITDA because once the true facts are established the accounting firm arbitrator can apply the applicable accounting rules to reach a decision.

23. In addition, Eternal seeks damages, including punitive damages, against Centre Lane for its fraudulent conduct.

**FIRST CLAIM FOR RELIEF: FRAUDULENT INDUCEMENT**

24. Eternal hereby realleges and incorporates paragraphs 1 through 23 of this Complaint as if fully set forth herein.

25. Centre Lane's representations made to induce the agreement to purchase the Company, as set forth above, were false.

7

26. Centre Lane knew that the representations were false at the time made, as Defendants had no intention to perform as required by the Purchase Agreement.

27. The misrepresentations and omissions of material fact by Centre Lane in connection with the purchase of the Company were made with the intent to induce Eternal to act upon them and agree to the sale.

28. Acting in justifiable reliance upon Centre Lane's misrepresentations that they intended to fulfil their duties and obligations to Eternal and the Company, Eternal entered into the Purchase Agreement. As a result of Eternal's justifiable reliance upon Centre Lane's misrepresentations, Eternal has suffered damages.

WHEREFORE, Eternal respectfully requests entry of a judgment for costs, compensatory damages, punitive damages, pre- and post-judgment interest, and for such and further relief as may be just and proper.

## SECOND CLAIM FOR RELIEF: PRAYER FOR DECLARATORY RELIEF

29. Eternal hereby realleges and incorporates paragraphs 1 through 23 of this Complaint as if fully set forth herein.

30. This is an action for declaratory relief to determine an actual, present, practical and bona fide controversy between Eternal and CHI concerning CHI's bad faith in operating the Company during the Earn-Out Period.

31. In particular, on outstanding payments, CHI has failed to follow any standard account collection procedures.

32. The write-off of even a single debt is enough to significantly reduce or eliminate altogether any Earn-Out Payment to Eternal.

33. Eternal contends that CHI has acted in bad faith with the specific objective lowering its EBITDA during the Earn-Out Period to avoid or reduce the Earn-Out Payment at the end of the Period.

34. CHI denies these contentions.

35. While the parties agreed to arbitrate their dispute concerning the proper EBITDA number through the use of accounting firm, they did not agree that the accounting firm arbitrator could decide questions of bad faith or commercial unreasonableness.

36. Thus, absent the requested declaration from this Court, the accounting firm arbitrator will be required to make a decision solely based upon the numbers and information provided by CHI and Eternal, and will have to render a decision without a declaration as to whether the numbers and information provided by CHI were issued in bad faith or through commercial unreasonable practices.

37. Eternal is entitled to a declaration from this Court that:

    a. CHI acted in bad faith with the intent of avoiding or reducing the Earn-Out Payment due to Eternal under the Purchase Agreement; and

    b. CHI did not use commercially reasonable efforts to operate the Company substantially in accordance with past practice and with the objective of facilitating the continued growth of the Company during the Earn-Out Period.

    c. As a result of (a) and (b) above, Clickbooth has breached its agreement with Eternal.

WHEREFORE, Eternal respectfully requests that the Court enter a judgment declaring that CHI has breached the terms of the Purchase Agreement as CHI has acted in bad faith with the intent of avoiding or reducing the Earn-Out Payment due to Eternal under the Purchase

Agreement and CHI did not use commercially reasonable efforts to operate the Business substantially in accordance with past practice and with the objective of facilitating the continued growth of the Company during the Earn Out Period. Eternal also requests that this Court award such other relief, including costs, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Eternal demands a trial by jury for all issues so triable.

Dated: May 30, 2017

Respectfully submitted,

JONATHAN B. MORTON
Florida Bar No. 956872
MALLORY M. COONEY
Florida Bar No. 125659
**K&L Gates LLP**
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, Florida  33131-2399
Telephone:  (305) 539-3300
Facsimile:   (305) 358-7095
jonathan.morton@klgates.com
mallory.cooney@klgates.com

*Attorneys for Plaintiff Eternal Strategies, LLC*